Daniel L. Miranda, Esq. SBN 021938
MIRANDA LAW FIRM
633 E. Ray Road, Suite #106
Gilbert, AZ  85296
Tel: (480) 719-8482
dan@mirandalawpc.com
*Attorneys for Plaintiff*
*Nutrition Distribution, LLC*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **NUTRITION DISTRIBUTION LLC**, an Arizona Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>**IQ FORMULATIONS, LLC**, an Florida Limited Liability Company, and DOES 1 through 10, inclusive,<br><br>Defendant(s). | CASE NO.<br><br>**COMPLAINT FOR FALSE ADVERTISING IN VIOLATION OF § 43 (a)(1)(B) OF THE LANHAM ACT**<br><br>**[DEMAND FOR A JURY TRIAL]** |

Plaintiff Nutrition Distribution, LLC, d.b.a. Athletic Xtreme ("Plaintiff" or "Nutrition Distribution"), by and through its undersigned attorneys, submits this Complaint against Defendant IQ Formulations, LLC, d.b.a. Metabolic Nutrition ("Defendant" or "Metabolic Nutrition"), and in support thereof, avers as follows:

## INTRODUCTION

1.      This is a civil action arising out of Defendant's false and misleading advertising regarding the stimulant DMHA (also known as "DMHA," "1,5-Dimethylhexylamine," "2-Aminoisoheptane," "2-amino-6-methylheptane" and "2-amino-5-methylhelptane," and referred to herein as "DMHA"). Which it offers for sale in retail stores and on its website www.metabolicnutrition.com (the "Website"). Specifically, Defendant sells two products, E.S.P. Extreme and Synadrex (the "DMHA Products") that contain DMHA.

2. DMHA was originally approved by the FDA in 1946 as an aerosolized treatment for bronchitis, laryngitis and other conditions in the form of a nasal inhaler. DMHA has never been approved for oral consumption and has been shown in studies to have powerful side effects in animal testing.

3. Despite this history, Defendant markets DMHA to bodybuilders, fitness enthusiasts and competitive athletes, touting the ability of these chemicals to safely and legally provide consumers energy and stimulate fat loss. However, DMHA is not recognized as safe or effective for any of the uses suggested on Defendant's website. In fact, laboratory tests have shown that DMHA is structurally and pharmacologically similar to the stimulants DMAA and DMBA (collectively, the "Banned Stimulants"), drugs that have been found to cause cardiac, nervous and psychiatric disorders including cerebral hemorrhage, cardiovascular resistance and heart attacks.

4. The extreme dangers posed by the Banned Stimulants, and DMHA's structural and pharmacological similarity to these substances, has led governments around the world to also ban or restrict the sale of DMHA. For example, the Canadian government has placed DMHA on its Cosmetic Ingredient Hotlist, a list of substances that are restricted and prohibited in cosmetics, and the Australian Department of Health has recommended that DMHA be placed on Australia's Schedule 10 of banned substances.

5. Defendant has not disclosed any of the negative side effects of DMHA to its customers. Defendant has also failed to disclose any of DMHA's history or clinical tests to its customers. Defendant has done so to gain an advantage in the competitive nutritional supplement marketplace at the expense of competitors like Plaintiff, without regard to the safety of its customers or the impact on the industry as whole.

6. Accordingly, Defendant has knowingly and materially participated in a false and misleading advertising campaign to promote and sell DMHA. Defendant's continuing false, misleading, illegal and deceptive practices have violated the Lanham Act and have unjustly enriched Defendant at the expense of Plaintiff, a legitimate sport supplement manufacturer, and

2

have caused Plaintiff extensive and irreparable harm, including but not limited to, loss of revenue, disparagement, and loss of goodwill.

7. Among other things, this action seeks to enjoin Defendant from the manufacture, marketing and sale of any and all products containing DMHA, including without limitation, DMHA, as Defendant is illegally and falsely marketing such products in violation of the Lanham Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction) because Plaintiff asserts causes of action arising under federal law and the parties are citizens of different states and the controversy exceeds the value of $75,000.

9. This Court has personal jurisdiction over Defendant because Defendant has, directly or through its intermediaries (including distributors, retailers, and others), developed, licensed, manufactured, shipped, distributed, offered for sale, sold and advertised DMHA in the United States and this district. Defendant has purposefully and voluntarily placed these products into the stream of commerce with the expectation that they will be purchased in this district.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions which gave rise to the claim occurred in this district. *Allstar Marketing Group, LLC v. Your Store Online*, LLC, 666 F. Supp. 2d 1109, 1128 (C.D. Cal. 2009). Alternatively, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3).

## PARTIES

11. Plaintiff Nutrition Distribution, LLC, d.b.a. Athletic Xtreme, is an Arizona limited liability company with its principal place of business at 14215 N. 8th Pl., Phoenix, Arizona, 85022.

12. Defendant IQ Formulations is a Florida limited liability company, which lists 10151 NW 67th Street, Tamarac, Florida 33321 as its principal business address.

13. Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and therefore sued these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

## FACTUAL ALLEGATIONS

14. The nutritional supplement industry is one of the fastest growing and most lucrative in the United States. A recent Forbes article estimates that nutritional supplement sales accounted for $32 billion in revenue in 2012 and predicts this number to grow to $60 billion within ten years. The growth and size of the nutritional supplement market and rigorous competition provide perverse incentives for false advertising and unfair competition prohibited by the Lanham Act.

### Plaintiff Nutrition Distribution & Lean FX

15. Plaintiff is a cutting edge sports supplement manufacturer and marketer. From its inception, Plaintiff was a leader in the nutritional supplement market, specifically for bodybuilding.

16. Plaintiff has products in several categories of body building products, including pre-workouts, muscle-gainers, fat burners and male performance enhancement.

17. For example, on its website, Plaintiff sells "Lean FX," a fat-burning product that competes directly with Defendant's DMHA Products.

### DMHA

18. DMHA was originally developed in the United States as an aerosolized treatment for bronchitis, laryngitis and other conditions. DMHA was initially approved by the FDA in 1946 as Eskay's Oralator. This inhaler appeared only in the 1949 edition of the Physicians' Desk Reference. A second aerosolized DMHA preparation (combined with propylhexedrine) was approved by the FDA in the 1960s; it was initially developed as Vaporpac [sic] and later its

4

name was changed to Tickle Tackel Inhaler [sic].

19. Despite FDA approval of these inhalers, there is no evidence that either Vaporpac or Tickle Tackel Inhaler was previously sold in the United States; neither of these inhalers appear in the Physicians' Desk Reference or other pharmaceutical reference texts. The FDA has never approved DMHA for consumption orally.

20. Approximately a dozen studies from the 1940s through the 1970s investigated the effects of DMHA in mice, rats, guinea pigs, rabbits, cats and dogs. These studies found that DMHA can increase blood pressure and cardiac output in larger animals. Central nervous system stimulation has been suggested by studies of rats and mice. Acute toxicity studies in cats found toxic doses of the drug led to dilated pupils, vomiting and convulsions.

21. Preliminary human studies of DMHA have also been published. In 1973, three male subjects received orally administered radiolabeled DMHA. Oral absorption was rapid with maximum serum concentrations two hours after consumption. In 1974, a combination product including DMHA, 3-octopamine and adenosine was studied as a treatment for low blood pressure in 20 patients. Two studies from the 1950s investigated the effects of an unspecified, inhaled dose of the drug in human subjects: it was found to increase lung volume. Given the lack of any placebo-controlled trial of DMHA as an individual drug, the safety of DMHA remains unknown, but the animal experiments suggest the potential for adverse cardiovascular effects

### Defendant's Sale and Advertising of DMHA

22. Defendant is a nutritional supplement company based in Florida who directly competes with Plaintiff in the fitness supplement marketplace.

23. Defendant markets, distributes and sells DMHA through its Website in various products, including the DMHA Products. On its marketing materials, attached hereto as Exhibit A, Defendant touts the numerous purported health and physical benefits of DMHA. For example, on its website Defendant sells E.S.P. Extreme, which contains 2 aminoisoheptane (DMHA). Under the description for this Stimulant Product, it says this: "E.S.P. EXTREME is

5

formulated to be the highest strength, energy Pre-Workout in the marketplace. *Designed for individuals who require higher potency stimulants to maximize performance, energy, and increase strength training during workouts. E.S.P. EXTREME's unique multi-dose scoop allows you to tailor its strength to meet your specific tolerance and workout requirements*." Defendant makes no mention of the pharmacological properties of DMHA, its history, or its side effects in its marketing materials for E.S.P. Extreme.

24. In its marketing materials for Synadrex, Defendant specifically addresses the side effects of the product, but only says that users should "assess [their] tolerance to prevent overstimulation."

25. Aside from Defendant's failure to inform its customers of the pharmacological properties of DMHA, its history, or its side effects, Defendant does not mention that DMHA is not recognized as safe or effective for any of the uses suggested on Defendant's website or that pharmacologically similar to the Banned Stimulants, drugs that have been found to cause cardiac, nervous and psychiatric disorders including cerebral hemorrhage, cardiovascular resistance and heart attacks.

26. It is generally understood in the illicit supplement industry that DMHA is meant to succeed the sale of the Banned Stimulants now that the FDA has banned the sale of these dangerous stimulants. The sale of DMHA by unscrupulous retailers such as Defendant is a naked attempt to make a quick buck while staying one step ahead of governmental agencies responsible for protecting the public from dangerous drugs.

27. Defendant's false advertising is harmful to the marketplace for dietary and nutritional supplements, as well as to the health of individual consumers. By including powerful drugs like DMHA in their products, Defendant has a clear edge over competitors that use only natural ingredients. Consumers will purchase Defendant's DMHA products instead of unadulterated products like Lean FX because of the profound effects of DMHA and the fact they are uninformed about the contents of the products. Consumers purchase Defendant's product. Defendant's conduct harms Plaintiff's commercial interests by creating demand for

6

illicit products like DMHA, and thereby taking customers from Plaintiff.

28. Defendant's sale of DMHA also harms the marketplace for workout products as whole, since many consumers leave the marketplace altogether once they are made aware of unscrupulous practices such as that of Defendant. As such, Defendant's conduct harms the goodwill in Plaintiff's products, and serves to disparage the industry as a whole.

## **CLAIM FOR RELIEF**

**(False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act)**

29. Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

30. On its website and through other promotional materials, Defendant has purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of DMHA by, without limitation, commercially marketing and mislabeling such products as an effective way to maximize work-out benefits, such as muscle growth, without mentioning the overwhelming clinical evidence that such products pose health risks. Defendant has failed to cite that DMHA has been demonstrated to have severe side effects, that it has never been approved for oral consumption, or that it is structurally similar to the Banned Stimulants.

31. The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers, including those in this district, into believing that they are purchasing a product with different characteristics.

32. This deception is material because (i) it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the health consequences of taking illegal stimulants, and (ii) such decision could lead to dangerous and unanticipated health consequences for such consumers.

33. Defendant has introduced its false and misleading statements into interstate commerce via marketing and advertising on its Website and shipment of its products into interstate commerce.

34. Plaintiff has suffered both an ascertainable economic loss of money and

reputational injury by the diversion of business from Plaintiff to Defendant and the loss of goodwill in Plaintiff's products. By including powerful drugs like DMHA in their products, Defendant has a clear edge over competitors like Plaintiff that use only compliant ingredients. Consumers will purchase Defendant's DMHA products instead of unadulterated products like Lean FX because of the profound effects of DMHA and the fact they are uninformed about the contents of the products. Consumers purchase Defendant's product. Defendant's conduct harms Plaintiff's commercial interests by creating demand for illicit products like DMHA, and thereby taking customers from Plaintiff.

35. Defendant's sale of DMHA also harms the marketplace for workout products as whole, since many consumers leave the marketplace altogether once they are made aware of unscrupulous practices such as that of Defendant. As such, Defendant's conduct harms the goodwill in Plaintiff's products, and serves to disparage the industry as a whole.

36. Defendant's actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising and promotion, misrepresent the nature, characteristics and qualities of Defendant's products in violation of Section 43(a)(1)(B) of the Lanham Act.

## PRAYER

Wherefore, Plaintiff Nutrition Distribution LLC prays for judgment against Defendant as follows:

1. For injunctive relief enjoining Defendant from falsely advertising any product containing DMHA;
2. For an award of compensatory damages to be proven at trial in accordance with 15 U.S.C. § 1117;
3. For an award of any and all of Defendant's profits arising from the foregoing acts in accordance with 15 U.S.C. § 1117 and other applicable laws;
4. For restitution of Defendant's ill-gotten gains;
5. For treble damages in accordance with 15 U.S.C. § 1117;

6. For punitive damages;

7. For costs and attorneys' fees; and

8. Any other relief the Court may deem appropriate.

DATED: January 31, 2018

MIRANDA LAW FIRM

By: *s/*
Daniel L. Miranda
*Attorneys for Plaintiff*
*Nutrition Distribution, LLC*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: January 31, 2018

MIRANDA LAW FIRM

By: ___s/_____
Daniel L. Miranda
*Attorneys for Plaintiff*
*Nutrition Distribution, LLC*
