WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Nutrition Distribution LLC,

    Plaintiff,

v.

IQ Formulations LLC, et al.,

    Defendants.

No. CV-18-00348-PHX-GMS

**ORDER**

Pending before the Court is Defendant IQ Formulations, LLC's Motion to Dismiss and alternative Motion to Transfer (Doc. 21). For the following reasons the motion to dismiss is granted and the alternative motion to transfer is denied as moot.

**BACKGROUND**

Nutrition Distribution ("Nutrition") and IQ Formulations ("IQ") compete in the exercise supplements industry. Nutrition is an Arizona limited liability company with its principal place of business in Phoenix. IQ is a Florida limited liability company with its principal base of business in Tamarac, Florida. Nutrition alleges in its First Amended Complaint ("FAC") that two IQ products, "E.S.P. Extreme" and "Synadrex," contain a chemical known as DMHA. Nutrition alleges that DMHA is a dangerous substance and that by marketing products containing DMHA as safe exercise supplements, IQ has violated the Lanham Act's prohibition of false, misleading, or deceptive advertising practices, thus injuring Nutrition, which is forced to compete against products that can be sold much cheaper because DMHA is inexpensive to produce.

IQ sells its products to a third party that has discretion to then resell the products nationwide or to other third-party resellers. IQ also operates a website—accessible in all fifty states—through which it sells its own products. This site generates approximately 8% of IQ's annual sales. IQ's website previously contained a feature that allowed users to locate third-party stores near them that might sell IQ products. The store-locator feature listed multiple stores in Arizona where customers could potentially purchase IQ products from a third party. Additionally, two Arizona-based websites sell Synadrex and E.S.P. Extreme. IQ does not, however, directly sell its products to the stores listed on its website or the two Arizona websites.

IQ moves to dismiss under Federal Rule of Civil Procedure 12(b)(2), arguing that due process prevents this court's exercise of jurisdiction over it because it lacks sufficient minimum contacts with Arizona.

**DISCUSSION**

**I.  Legal Standard**

Nutrition bears the burden of establishing personal jurisdiction. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002). It can meet this burden by alleging facts that, if true, would support personal jurisdiction over IQ. *See Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). However, Nutrition cannot "simply rest on the bare allegations of its complaint" if IQ presents affirmative evidence contradicting the jurisdictional allegations in the complaint, *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977), but must present proof of personal jurisdiction through affidavits and declarations. *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). Once the parties have presented affidavits or other jurisdictional evidence, uncontroverted statements in the complaint are taken as true, and conflicts between facts contained in competing affidavits are resolved in Nutrition's favor. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

/ / /

/ / /

## II. Analysis

Arizona's long arm statute extends jurisdiction "to the maximum extent permitted by the . . . Constitution of the United States," so resolution of the issues here requires only a Due Process analysis. *See* Ariz. R. Civ. P. 4.2(a); *Davis v. Metro Prod., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989). The Due Process Clause requires that nonresident defendants have sufficient "minimum contacts" with the forum state so that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Due process protects a defendant's "liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties or relations.'" *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269–70 (9th Cir. 1995) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985)). Courts must determine whether the defendant's contacts with the forum are sufficient to support either "general" or "specific" jurisdiction. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984).

### B. General Personal Jurisdiction

To be subjected to general personal jurisdiction, the Defendant must have "affiliations so continuous and systematic as to render the foreign corporation essentially at home in the forum State, *i.e.*, comparable to a domestic enterprise in that state." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015). IQ contends that Nutrition has failed to allege facts establishing that IQ is subject to general personal jurisdiction in Arizona. Nutrition concedes the point by failing to respond to it. At any rate, IQ's contacts with Arizona are insufficient to subject it to general personal jurisdiction.

### C. Specific Jurisdiction

The Ninth Circuit applies a three-part test to determine whether the defendant's contacts with the forum state are sufficient to subject it to the state's specific jurisdiction. Specific jurisdiction exists only if (1) the defendant purposefully availed itself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws, or purposely directs conduct at the forum that has effects in the

forum; (2) the claim arises out of the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, *i.e.*, it is reasonable. *See Schwarzenegger*, 374 F.3d at 802 (citing *Burger King*, 471 U.S. at 476–78). The plaintiff must satisfy the first two prongs of the test. *Id.* If it does so, a presumption of reasonability arises, and the defendant must then make a "compelling case" that jurisdiction would not be reasonable. *Haisten v. Grass Valley Medical Reimbursement Fund*, 784 F.2d 1392, 1397 (9th Cir. 1986).

In tort cases, courts in this circuit apply a "purposeful direction" analysis for the first prong. *Yahoo! Inc. v. La Ligue Contre Le Recisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). Lanham Act cases sound in tort, so that analysis applies to this case. *See Nutrition Distribution LLC v. Juggernaut Nutrition LLC*, No. CV-18-00762-PHX-JAT, 2018 WL 4385598, at *2 (D. Ariz. Sept. 14, 2018). The Ninth Circuit evaluates "purposeful direction" using the Supreme Court's "effects" test in *Calder v. Jones*, 465 U.S. 783 (1984). *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010). That test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered at the forum state." *Yahoo!*, 433 F.3d at 1206 (9th Cir. 2006).

### 1. Intentional Act

The parties do not contest this element. "We construe 'intent in the context of the 'intentional act' test as referring to an intent to perform an actual physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. IQ clearly intended to sell its products alleged to contain DMHA.

### 2. Express Aiming

"Purposeful direction" and "express aiming" are highly abstract phrases that "in the jurisdictional context hardly define[] themselves." *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000), *overruled in part on other grounds by Yahoo!*, 433 F.3d at 1207. The Supreme Court has employed the "stream of commerce"

metaphor to analyze situations in which an entity places a product into circulation by selling that product to another entity that then sells the product in another market. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987). The Ninth Circuit has followed Justice O'Connor's plurality approach in *Asahi* by holding that "[t]he placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state." *Holland America Line Inc. v. Wartsila North America, Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (citing *Asahi*, 480 U.S. at 112). "Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state." *Id.*

Here, IQ's conduct does not qualify as "express aiming" at Arizona, and thus IQ has not purposefully directed its conduct at the state. Nutrition puts forth two theories to support its contention that IQ has purposefully directed its conduct at Arizona. First, Nutrition claims that by selling its product to a third party that has discretion to distribute IQ's product around the country—apparently including multiple locations and websites in Arizona—IQ has purposely directed its conduct at Arizona. Second, it argues that IQ's direct sales website is sufficient to subject it to personal jurisdiction in Arizona.

The first argument fails. "The placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state." *Holland America Line Inc. v. Wartsila North America, Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (citing *Asahi*, 480 U.S. at 112). IQ sells its products to a third party, which then has discretion to re-sell IQ's products to a variety of vendors. (Doc. 21-1 at 11–12 ¶ 19). IQ does not contract with or sell products to any of the stores or websites that Nutrition points to. (*Id.* at 11 ¶ 18). Further, IQ does not actively market or solicit the sale of the products to any of the retailers that Nutrition identifies. (*Id.* at 12 ¶ 23). Even if IQ is aware—as it apparently is—that its product will be swept by the stream of commerce into Arizona, that awareness "does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state." *Holland America Line*, 485 F.3d at 459.

The store-locator feature on IQ's website is also insufficient to establish "express aiming" under the *Calder* test. IQ receives no purchase orders from and does not enter agreements with any of the retailers listed on the website. (*Id.* at ¶ 24). IQ does not verify that any of the stores listed actually sell any of its products, and IQ has in fact verified—in response to this litigation—that some of the stores listed *do not* sell its products. (*Id.* at ¶ 25; 13 ¶ 29). It appears that IQ derives no direct benefit at all by listing the stores on its website, and its CEO describes listing the stores as "a courtesy." (*Id.* at 12 ¶ 25). IQ's website suggests some locations down the stream of commerce where its products may (or may not) be found. While this demonstrates that IQ is aware that its products may reach Arizona, it "does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed" at Arizona. *Holland America Line*, 485 F.3d at 459.

IQ's direct-sales website is also insufficient to establish express aiming. Nutrition alleges that IQ "has, through wholesalers, shipped, distributed, offered for sale, sold and advertised its supplement products in [Arizona]." (Doc. 18 at ¶ 10). IQ has countered these allegations with a declaration stating that IQ does not sell the products at issue to any of the stores listed in the Complaint, nor does it sell the products to the two websites listed in the Complaint. (Doc. 21-1 at 11–14 ¶¶ 18–33). Regarding its website, IQ's declaration states that only 8% of its overall company sales are made through the website. (*Id.* at ¶ 21). And of the sales of the two products at issue, only a miniscule fraction of sales—0.05% of one product and 0.26% of the other—are made to Arizona residents, while the overwhelming majority of sales are made to customers in Florida.[1] Nutrition offers no evidence in response. Such small percentages are insufficient to establish that IQ "expressly aimed" its conduct at Arizona, particularly when IQ has no other presence at all in the state. *See Monje v. Spin Master Inc.*, No. CV-09-1713-PHX-GMS, 2013 WL 2369888, at *7 (D. Ariz. May 29, 2013) (noting that under *J. McIntyre Machinery, Ltd. v.*

---

[1] According to IQ's declaration, in 2017 only 92 of 35,707 units of one product and 11 of 20,597 units of the other product were sent to Arizona. (Doc. 21-1 at 3 fn.2).

*Nicastro*, 564 U.S. 873, 888–89 (2011), "quantity matters."); *Nutrition Distribution, LLC v. Muscle Store, Inc.*, No. CV-17-02116-PHX-GMS, 2017 U.S. Dist. Lexis 177676 (D. Ariz. Oct. 26, 2017).

Nutrition cites a case from this Court to argue that personal jurisdiction may be exercised over IQ here. In *Monje v. Spin Master Inc.*, this Court concluded that it had personal jurisdiction over the defendant. No. CV-09-1713-PHX-GMS, 2013 WL 2369888 (D. Ariz. May 29, 2013). In *Monje*, the defendant was an Australian company registered in Melbourne. *Id.* at *1. The defendant contracted with a third party to oversee the production of its product and its distribution in the United States. *Id.* This Court held that the defendant had not "passively launch[ed] its product into the stream of commerce." *Id.* at *7. Rather, the defendant "was involved in every aspect of the [product]—from design, to manufacture, to distribution—to a degree sufficient to convince this Court that it [could] exercise jurisdiction" over the defendant. *Id.* The defendant supplied its distributors with "a wealth of marketing material"; it did not relinquish full control of product distribution; it ordered distribution stopped when safety concerns arose; its website specifically targeted the United States market and invited "stateside" customers to contact the defendant to find out where they could purchase its products. *Id.* at *7–*8. Although a third-party producer and distributor were involved, it was clear in *Monje* that the defendant was involved in the production and distribution of its product sufficiently to conclude that it had expressly aimed its conduct at the forum.

In contrast, in this case, IQ does not "work closely with another entity to execute" a plan to have its products sold in Arizona. *Id.* at *9. Rather, IQ produces its product, and then sells it to a third party that has complete discretion to re-sell the products to other distributors if it chooses to do so. (Doc. 21-1 at 12 ¶ 24). IQ does not verify what third-party retailers its products are sold to.[2] (*Id.*). It has not been alleged that IQ retains any

---

[2] Obviously, IQ must receive information about third parties that sell its products from somewhere, or its store-locator feature could not exist at all. But according to the affidavit of its CEO, IQ is uninvolved with its distributor's decisions to sell its products. The assertion that IQ does not verify the retailers that actually carry its product is supported by the fact that IQ, in response to this litigation, confirmed that some of the stores listed on its

- 7 -

downstream control over the distribution of its products once they have been sold to the distributor. Nutrition has not alleged that IQ is actively involved in marketing efforts with the distributor. It is not clear that IQ could order its products pulled from the shelves if such action was necessary—it does not deal directly with any of the Arizona stores or websites. Even though IQ's website does list locations of retailers that may (or may not) sell IQ's products, the fact that it does not verify whether those retailers actually sell its products suggests that the store-locator feature is not directly targeted at Arizona. Unlike the defendant in *Monje*, IQ does not retain close control over its product once it has been launched into the stream of commerce.

Nutrition has failed to allege facts sufficient to demonstrate that IQ expressly aims its conduct at Arizona. This in turn means that IQ has not purposefully directed its conduct at Arizona. Nutrition has therefore failed to meet its burden of showing that IQ is subject to personal jurisdiction in Arizona. Because the Court concludes that Nutrition has failed to establish that the Court has personal jurisdiction over IQ, the Court does not address the third prong of the *Calder* test.

### D. Transfer

Even though this Court lacks personal jurisdiction over IQ, it has the authority to transfer the case pursuant to 28 U.S.C. § 1406(a). *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962) ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not."). When a suit is in the wrong venue, the district court "shall dismiss, or if it be in the interest of justice, transfer such case." 28 U.S.C. § 1406(a). Transfer is normally in the interest of justice because "dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating." *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (quotation marks omitted). The values underlying the preference for transfer include protecting uninformed plaintiffs and "removing whatever obstacles may impede an

---

website do not actually carry its products.

expeditious and orderly adjudication of cases and controversies on their merits." *Goldlawr*, 369 U.S. at 466–67 (1962).

Here, considering those values, dismissal without prejudice is the appropriate result. Nutrition is no stranger to lawsuits of this type, and particularly to fights over motions to dismiss for lack of personal jurisdiction. Nutrition is in no way an "uninformed plaintiff." Further, IQ attempted to resolve the jurisdiction issue without filing a motion to dismiss, but Nutrition refused, thus necessitating the current motion.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant IQ Formulations, LLC's Motion to Dismiss (Doc. 21) is **GRANTED** and this case is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action and enter judgment accordingly.

Dated this 7th day of March, 2019.

_____
G. Murray Snow
Chief United States District Judge